# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
October 29, 2015 Session

## DAVID JONES, ET AL. v. CITY OF UNION CITY, TENNESSEE

**Direct Appeal from the Circuit Court for Obion County**
**No. CC-12-CV-84      William B. Acree, Judge**

---

### No. W2013-02358-COA-R3-CV – Filed December 17, 2015

---

This appeal involves three former police officers who were terminated from their employment with the Union City Police Department.  They filed this lawsuit claiming that they were terminated solely for refusing to remain silent about illegal activities, in violation of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.  The trial court granted summary judgment to the City, concluding that Plaintiffs failed to establish an exclusive causal relationship between their refusal to remain silent and their discharge and that the City terminated Plaintiffs for rational and non-pretextual reasons.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ROGER A. PAGE, SP. J., joined.

Anne Hunter Williams, Heather Moore Collins, Brentwood, Tennessee, and Michael L. Russell, Franklin, Tennessee, for the appellants, David Jones, Randy O'Dell, and Ashley Thompson Merrill.

Pamela G. Vawter and Michael R. Hill, Milan, Tennessee, for the appellee, City of Union City, Tennessee.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

On the evening of August 7, 2010, shortly after his shift ended, Union City police officer Michael Hogg reported to the Obion County Sheriff's Department that his four-wheeler had been stolen.  Earlier that year, Hogg repeatedly tried to convince fellow Union City police officer Randy O'Dell to buy the four-wheeler or find someone who

would.  When O'Dell told Hogg that he could not afford the four-wheeler, Hogg suggested that O'Dell could "just take it home and you can have it."  Hogg told O'Dell that he wished someone would steal the four-wheeler so that he could turn it in to his insurance.  Hogg said he was done with the four-wheeler and did not want it.  Odell learned that Hogg reported the four-wheeler stolen the same night Hogg filed the report. He thought the theft report was "kind of odd" given the comments Hogg made about wishing it would be stolen.  O'Dell felt suspicious about the situation, but he did not report his suspicion to the chief of police, to the Obion County Sheriff's Department, or to the District Attorney's office.  Instead, he contacted Hogg about the comments he had made and told Hogg it sounded "funny."  Within weeks of the theft report, O'Dell learned that Hogg also made comments to fellow Union City police officer David Jones about wanting to get rid of the four-wheeler before it was reported stolen.

Hogg had approached Jones to ask if he wanted the four-wheeler about a year before it was reported stolen.  Jones told Hogg that he could not afford the four-wheeler, and in response, Hogg stated that Jones could "just come take it," and Hogg would claim it on his insurance.  Jones believed Hogg was trying to "set him up."  Jones learned of Hogg's theft report shortly after it was made.  However, Jones did not inform the chief of police, the Obion County Sheriff's Department, or the District Attorney's office about Hogg's previous comments.

Fellow officer Ashley Thompson Merrell was on duty the night the four-wheeler was reported stolen and heard the dispatcher's announcement to "be on the lookout" for the four-wheeler.  She immediately questioned why Hogg would have gone home from work at night and immediately noticed that his four-wheeler was missing.  While patrolling, Merrell encountered an Obion County sheriff's deputy and mentioned the stolen four-wheeler to him.  The sheriff's deputy told Merrell that Hogg asked him about buying it several months earlier, but the sheriff's deputy said he could not afford it.  Later that night, Merrell spoke with O'Dell and learned that Hogg had been trying to get rid of the four-wheeler for about a year.  The next night, Merrell discussed the four-wheeler with Jones and learned that Hogg had also tried to convince him to buy it.  Jones and Merrell discussed Hogg's comment that Jones "could just have it," and Jones's suspicion that Hogg was trying to set him up.

Merrell later admitted she thought it was "kind of fishy" that the four-wheeler was reported stolen after Hogg wanted to get rid of it.  She, Jones, and O'Dell discussed how it seemed "a little fishy" that Hogg wanted to get rid of the four-wheeler and its payment obligation, then he reported it stolen.  Merrell also advised her husband that it "seemed a little fishy" that Hogg reported the four-wheeler stolen and that she wished she had more information.  Nevertheless, she did not report the information to the chief of police, the Obion County Sheriff's Department, or the District Attorney's office, and the crime

2

remained unsolved for over a year.

The Union City Police Department held a week-long in-service between October 31 and November 4, 2011. Tensions arose when the chief of police, Joe Garner, announced a possible change to twelve-hour shifts for the officers. Many officers were highly upset and opposed the shift change. Merrell and O'Dell were among those who opposed it. Hogg was very vocal in favor of the shift change and openly antagonized the officers who opposed it. Hogg and another officer had a heated disagreement that escalated into a loud "cussing match."

At some point during in-service, O'Dell had a conversation with Hogg and asked if he had heard any news about his four-wheeler. Hogg replied, "The damn thing's probably painted blue somewhere." Later, during an in-service break, O'Dell told Merrell and other officers about Hogg's comment. The officers decided to report Hogg and their suspicion that he may have filed a false report to commit insurance fraud. Merrell volunteered to contact a local agent who worked for the Tennessee Bureau of Investigation ("TBI"). First, however, Merrell contacted her shift supervisor, Sergeant Tim Wright, who told her he did not see a problem with her contacting the TBI agent about Hogg.

Late that evening, Merrell met with the TBI agent and informed him of Hogg's comments. The TBI agent told Merrell to meet him at the District Attorney's office at 8:00 a.m. the following morning with the other officers who were involved, including O'Dell and Jones. Afterward, Merrell told O'Dell and Jones that they were directed to go to the District Attorney's office; however, none of the three police officers appeared at the appointed time.

That same week, on or about November 4, 2011, the TBI agent contacted the assistant chief of police at the Union City Police Department, Perry Barfield, and informed him that the TBI had contacted the District Attorney's office and requested an investigation concerning allegations that Hogg falsely reported his four-wheeler stolen. Assistant Chief Barfield notified Chief Garner and the City Manager of Union City, Kathy Dillon. However, at the request of the TBI, and pursuant to departmental policy, the police department's internal investigation of the matter was delayed pending the TBI investigation. The Chief, Assistant Chief, and City Manager refrained from discussing the matter with Merrell, O'Dell, and Jones during the TBI investigation. However, at some point, Hogg, Merrell, O'Dell, and Jones were placed on administrative leave with pay pending conclusion of the investigation.

Merrell, O'Dell, Jones, and other officers were interviewed by TBI agents during the investigation. The TBI kept Assistant Chief Barfield and Chief Garner informed

3

throughout its investigation. They were aware that Merrell, O'Dell, Jones, and other officers were interviewed by the TBI as part of the investigation. Hogg was also interviewed and confessed to the crime on December 21, 2011. Hogg was terminated from his position with the Union City Police Department and subjected to criminal prosecution. He pleaded guilty to making a false report and other related charges.

At the conclusion of the TBI investigation, the TBI provided a copy of its investigative file and report to Assistant Chief Barfield and Chief Garner. The file included statements signed by Merrell, O'Dell, and Jones. Assistant Chief Barfield conducted an internal affairs investigation for the Union City Police Department and interviewed numerous officers, including Merrell, O'Dell, and Jones. Based on the information received from the TBI and the internal affairs investigation, Assistant Chief Barfield issued an internal affairs report recommending the termination of Merrell, O'Dell, and Jones. He met with Chief Garner to discuss his findings. Chief Garner agreed with the internal affairs report and its recommendation and likewise recommended that Merrell, O'Dell, and Jones be terminated. Both Chief Garner and Assistant Chief Barfield told the three officers that the reason they were recommending their termination was because they had not reported the information about Hogg sooner.

On January 13, 2012, Chief Garner signed a Personnel Action Request form, which was provided to each of the three officers, recommending their termination for several violations of departmental policy and the code of ethics. The internal affairs report for each officer was attached.[1] The internal affairs reports listed the departmental policies and ethics code that Assistant Chief Barfield and Chief Garner believed were violated. These included the following policies, which were contained in the Police Department Manual's Policy and Procedures:

---

[1] The report for O'Dell recounted that he was approached by Hogg and asked to take the four-wheeler; he later became aware it was reported stolen; O'Dell contacted Hogg to ask him if it had been stolen; he learned that Hogg also approached Jones and a sheriff's deputy; O'Dell admitted this seemed odd or funny; Hogg later told O'Dell the four-wheeler was probably painted blue somewhere; none of this information was reported until November 2011, when the report was initiated by another officer; and O'Dell was instructed to contact the authorities but failed to report to them. The internal affairs report for Jones found that Hogg asked him to take the four-wheeler and said he would turn it in to his insurance; Jones became aware that Hogg reported the four-wheeler stolen; Jones learned that O'Dell and the sheriff's deputy were also approached by Hogg; Jones admitted this was suspicious; the information was not reported until November 2011, when another officer initiated the report; and Jones was instructed to contact the authorities but failed to do so. Finally, the internal affairs report for Merrell found that she was on duty the night the four-wheeler was reported stolen and thought the circumstances were suspicious; she had conversations with three individuals who informed her that Hogg tried to convince them to take the four-wheeler; in November 2011, Merrell became angry with Hogg and based on that decided to report the information to the TBI; and the TBI agent instructed Merrell to report to the District Attorney's office and to the department's administration but she failed to do so.

4

REPORTING VIOLATIONS

Members having knowledge of other members violating the laws, ordinances, or departmental rules, or disobeying orders, shall report such violations in writing to the Chief of Police through official channels.

STANDARDS

. . . .

E. Cooperation With Other Law Enforcement Agencies - Members shall cooperate with all law enforcement agencies, other city departments, and public service organizations and shall give such aid and information as such organization may be entitled to receive.

. . . .

PROHIBITED OR REQUIRED ACTIVITIES

. . . .

B. Investigation - Officers shall not withhold any information on criminal activity or undertake self-assigned investigations without prior or prompt documentation and notification of a supervisor.

The referenced Law Enforcement Code of Ethics provided, "I WILL never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions." Finally, the manual provided specific "offenses for which disciplinary action may be taken," which included any act or omission constituting a violation of the departmental rules and procedures manual, and also "[f]ailure to report honestly and accurately all facts pertaining to an investigation or other matter of concern to the department."

As City Manager, Kathy Dillon had final decision making authority over the officers' terminations. She met with each of the three officers individually prior to reviewing the investigative file. The following week, Dillon announced that she agreed with the recommendation to terminate the officers and signed the Personnel Action Request forms, effectuating the officers' termination. Dillon believed that the officers' conduct in failing to come forward in a timely fashion violated an important public trust that is placed on an officer of the law and compromised their integrity as officers.

On April 19, 2012, Merrell, O'Dell, and Jones (collectively, "Plaintiffs") filed this lawsuit against the City of Union City. Plaintiffs alleged that they "refused to remain silent" about Hogg's illegal activity and that "the City was angered that Plaintiffs would not conceal the crimes of a fellow officer." Plaintiffs claimed that the City terminated them "solely for reporting the illegal conduct of Hogg." Plaintiffs asserted claims pursuant to the Tennessee Public Protection Act, which provides, "No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b).

The City filed an answer denying the allegations of the complaint and claiming that its decision was based on legitimate, nondiscriminatory, business-related reasons, undertaken in good faith, and in no way motivated by or in retaliation for Plaintiffs' communications regarding illegal activity. Discovery ensued.

On July 17, 2013, the City filed a motion for summary judgment. The City asserted that Plaintiffs lacked sufficient evidence to establish that their refusal to remain silent about Hogg's criminal activity was the sole and exclusive cause of their termination, or, for that matter, any consideration at all. The City argued that Plaintiffs were terminated not for their refusal to remain silent about Hogg's criminal activity but for the knowledge they possessed and withheld pertaining to Hogg's criminal activity. In support of its motion for summary judgment, the City submitted the police department's policy manual, the internal affairs reports, numerous discovery responses, the affidavits of Assistant Chief Barfield, Chief Garner, and Kathy Dillon, and excerpts from the depositions of Merrell, O'Dell, and Jones.

Plaintiffs filed a response to the City's motion for summary judgment raising several different arguments. Plaintiffs claimed they possessed "a myriad of evidence" that the City's stated reason for their termination was untrue and pretextual. Plaintiffs pointed to the temporal proximity of the events, emphasizing that they were terminated soon after they were interviewed by the TBI. They claimed that various city officials gave inconsistent descriptions of the City's reporting policy during their depositions, creating a credibility issue for a jury. They argued that Chief Garner's deposition testimony should be construed as an admission of sole causation. Plaintiffs also claimed that two other police officers knew about Hogg's activity and failed to report it, but they were not terminated. Finally, Plaintiffs argued that the City's reporting policies were invalid because they contradicted the Tennessee Public Protection Act. In support of its response to the motion for summary judgment, Plaintiffs submitted nine full-length depositions.

After a hearing, the trial court entered an order granting the City's motion for summary judgment. For reasons that will be discussed in more detail below, the trial

6

court found that Plaintiffs were "unable to establish an exclusive causal relationship between the plaintiffs' refusal to remain silent about the illegal activities of Officer Hogg and the city's discharge of them." Plaintiffs timely filed a notice of appeal.

## II. ISSUES PRESENTED

Plaintiffs raise two issues in their brief on appeal:

1. Whether the trial court erred by resolving disputed facts in favor of the moving party by finding that Plaintiffs failed to properly report illegal activity; and

2. Whether a legal issue exists regarding whether an employer can implement a policy that has a chilling effect on reporting illegal activities under [the] Tennessee Public Protection Act.

For the following reasons, we affirm the decision of the circuit court.

## III. STANDARD OF REVIEW

We review a trial court's ruling on a motion for summary judgment de novo without a presumption of correctness. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The party moving for summary judgment may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, No. W2013-00804-SC-R11-CV, --- S.W.3d ---, 2015 WL 6457768, at *22 (Tenn. Oct. 26, 2015). When a motion for summary judgment is properly supported as provided in Tennessee Rule of Civil Procedure 56, to survive summary judgment, the nonmoving party may not rest upon the mere allegations or denials of its pleading, but must respond, and by affidavits or one of the other means provided in Rule 56 set forth specific facts at the summary judgment stage showing that there is a genuine issue for trial. *Id.* Summary judgment should be granted if the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial. *Id.* (citing Tenn. R. Civ. P. 56.04, 56.06).

## III. DISCUSSION

"'The employment-at-will doctrine is a bedrock of Tennessee common law.'" *Williams v. City of Burns*, 465 S.W.3d 96, 108 (Tenn. 2015) (quoting *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006)). Under the employment-at-will doctrine, "employment for an indefinite period of time may be terminated by either the employer or the employee at any time, for any reason, or for no reason at all." *Id.* (citing *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 26-27 (Tenn. 2011); *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534-35 (Tenn. 2002)). In other words, an employer may discharge an employee-at-will without breach of contract for good cause, bad cause or no cause at all, without being guilty of legal wrong. *Id.* (citing *Harney v. Meadowbrook Nursing Ctr.*, 784 S.W.2d 921, 922 (Tenn. 1990)). This is the traditional rule in Tennessee, but it is not absolute. *Id.* Some restrictions are imposed on the right of the employer to discharge an employee. *Id.*

The Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, is sometimes called the Whistleblower Act. *Williams*, 465 S.W.3d at 101. It creates "a narrowly crafted exception to the long-established common law employment-at-will doctrine." *Sykes*, 343 S.W.3d at 26. As noted above, the TPPA provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b). Notably, the TPPA requires the plaintiff to prove that retaliation for the protected conduct was "the *sole* reason" for his or her termination. *Williams*, 465 S.W.3d at 110. The Tennessee General Assembly enacted "'a stringent standard and set the bar high for recovery'" for a retaliatory discharge claim pursuant to the TPPA. *Id.* (quoting *Sykes*, 343 S.W.3d at 28). The statute's use of the term "solely" means that an employee can prevail with a TPPA claim "only if he or she can prove that his or her refusal to participate in or to remain silent about illegal activities was the only reason for the termination." *Id.* at 110-11 (quoting *Darnall v. A+ Homecare, Inc.*, No. 01-A-01-9807-CV-0034, 1999 WL 346225, at *8 (Tenn. Ct. App. June 2, 1999) (Koch, J., concurring)).

In 2011, the Tennessee General Assembly amended section 50-1-304 to add a subsection setting forth "a statutory burden-shifting framework to be applied to all claims under the TPPA, both for summary judgment motions and for trial." *Williams*, 465 S.W.3d at 112 n.15 (citing 2011 Tenn. Pub. Acts ch. 461). Currently, that subsection provides:

> In any civil cause of action for retaliatory discharge brought pursuant to this section, or in any civil cause of action alleging retaliation

for refusing to participate in or remain silent about illegal activities, the plaintiff shall have the burden of establishing a prima facie case of retaliatory discharge. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the plaintiff's discharge. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the plaintiff's discharge and that the stated reason was a pretext for unlawful retaliation. The foregoing allocations of burdens of proof shall apply at all stages of the proceedings, including motions for summary judgment. The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of unlawful retaliation.

Tenn. Code Ann. § 50-1-304(f).[2]

A TPPA claim requires proof of four elements:

(1) the plaintiff was an employee of the defendant;

(2) the plaintiff refused to participate in or remain silent about illegal activity;

(3) the defendant employer discharged or terminated the plaintiff's employment; and

(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Williams*, 465 S.W.3d at 111 (citing *Sykes*, 343 S.W.3d at 26-27). Therefore, in order to establish a prima facie case of retaliation under the TPPA, the plaintiff employee "must demonstrate that he engaged in conduct protected by the TPPA, that the protected conduct was known to the defendant, that the defendant thereafter discharged him, and that there was the requisite causal connection between the protected conduct and the discharge." *Id.* at 113 (citing *Allen v. McPhee*, 240 S.W.3d 803, 820 (Tenn. 2007), *abrogated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010)).

---

[2] When added in 2011, this subsection was designated subsection (g). 2011 Tenn. Laws Pub. Ch. 461. In the current version of the statute, it appears as subsection (f). Tenn. Code Ann. § 50-1-304 (2014).

An employee who establishes a prima facie case of retaliatory discharge creates a rebuttable presumption that the employer unlawfully retaliated against the employee. *Id.* at 115 (citing *Wilson v. Rubin*, 104 S.W.3d 39, 50 (Tenn. Ct. App. 2002)). The burden then shifts to the employer to articulate a non-retaliatory reason for the discharge. *Id.* (citing *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 389 (Tenn. Ct. App. 2006)). The sole causation element of a TPPA claim has an important impact at this stage:

> In articulating a non-retaliatory reason for discharging the employee, the defendant employer in a TPPA case need not proffer evidence that unlawful retaliation was no part of its decision to terminate employment. Rather, the employer need only introduce admissible evidence showing that unlawful retaliation was not the *sole* cause of the employment action. That is, the employer must proffer evidence that, even if retaliation was a motivation for the discharge, there was at least one non-retaliatory reason as well.

*Williams*, 465 S.W.3d at 115.

Assuming for the sake of argument that Plaintiffs established a prima facie case, we conclude that the City met its burden of producing evidence that one or more legitimate, nondiscriminatory reasons existed for Plaintiffs' discharge.[3] *See* Tenn. Code Ann. § 50-1-304(f). In this case, the City filed a motion for summary judgment claiming that Plaintiffs lacked sufficient evidence to establish that their refusal to remain silent about Hogg's criminal activity was the sole and exclusive cause of their termination, or any consideration at all. The City argued that Plaintiffs were terminated because of the knowledge they possessed and withheld pertaining to Hogg's criminal activity. In other words, the City claimed, its decision was motivated "not by Plaintiffs' refusal to remain silent, but in their persistence in remaining silent for so long." The City submitted the police department's policy manual, the internal affairs reports, discovery responses, the affidavits of Assistant Chief Barfield, Chief Garner, and Kathy Dillon, and excerpts from the depositions of Merrell, O'Dell, and Jones in support of its motion for summary judgment.

---

[3]"Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Zakour v. UT Med. Grp., Inc.*, 215 S.W.3d 763, 770 (Tenn. 2007) (quoting *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (quoting *Aikens*, 460 U.S. at 715)).

The affidavit of Assistant Chief Barfield stated that the information he reviewed from the TBI file indicated that Merrell, Jones, and O'Dell had knowledge of Hogg's comments about getting rid of the four-wheeler and claiming it on his insurance over a year prior to Merrell's report to the TBI. Barfield believed, based on his investigation, that Plaintiffs considered Hogg's comments and the circumstances surrounding the theft report to be "fishy," "suspicious," and/or "odd," yet they failed to report these suspicions when they initially gained the information. Barfield stated that Plaintiffs' eventual reporting of information related to Hogg's criminal activity "was in no way a reason or consideration" for his recommendation that they be terminated. He claimed he was never angered or upset that Plaintiffs divulged information about Hogg. "Rather," he explained, "I was concerned and upset that Plaintiffs withheld information for over a year before doing so." In sum, Assistant Chief Barfield stated that the sole reason for his recommendation of termination was his concern regarding Plaintiffs' failures to come forward with information sooner and his honest belief that their conduct violated department policies and ethical standards.

Chief Garner stated in his affidavit that he conducted an independent and thorough review of the TBI file and internal affairs file and reached the same conclusions as Assistant Chief Barfield. He stated that he advised each of the Plaintiffs that his decision was motivated by their failure to come forward with the information they had at or near the time of the theft report rather than waiting until November of 2011. Both Chief Garner and Assistant Chief Barfield stated that they never threatened or discouraged Plaintiffs in any way from coming forward with information about Hogg.

City Manager Kathy Dillon stated in her affidavit that she had final decision-making authority to terminate regular employees of the Union City Police Department pursuant to the city charter and personnel policy. Dillon was aware of the TBI investigation and internal affairs investigation, and she was advised of the recommendations of Assistant Chief Barfield and Chief Garner. Dillon stated that she met with each of the Plaintiffs individually and conducted a thorough and independent review of all the information in the internal affairs file, including the policy manual and transcripts of the interview statements of the Plaintiffs and other employees. Dillon stated she concluded that Plaintiffs should be terminated based on her honest belief that Plaintiffs had access to information or gut feelings that Hogg may have been involved in criminal activity, which they withheld for over a year, in violation of departmental policy and ethical standards. She stated her belief that the officers' conduct in failing to come forward in a timely fashion violated an important public trust that is placed on an officer of the law and compromised their integrity as officers. Dillon stated she was not upset that Plaintiffs reported Hogg's criminal activity, and their report was not a factor in her decision.

11

Because the City met its burden of producing evidence of a legitimate, nondiscriminatory reason for Plaintiffs' discharge, the burden shifted to Plaintiffs to demonstrate that the reason given by the City was not the true reason for their discharge and that the stated reason was a pretext for unlawful retaliation. *See* Tenn. Code Ann. § 50-1-304(f). In response to the City's motion for summary judgment, Plaintiffs admitted that Assistant Chief Barfield "honestly believed that Plaintiffs' conduct had violated police department policies for professional conduct and responsibilities, including reporting violations, the code of ethics, cooperation with other law enforcement agencies, and failure to report honestly and accurately all facts pertaining to an investigation." They also admitted that Dillon had final decision making authority over the terminations, and that "Dillon believed that the Plaintiffs' conduct in failing to come forward in a timely fashion violated an important public trust that is placed on an officer of the law and compromised their integrity as officers."

Despite these admissions, however, Plaintiffs raised several arguments in support of their position that the City's stated reason for their termination was pretextual. They present these arguments on appeal.

## A.

First, Plaintiffs argued that Chief Garner and Assistant Chief Barfield "admitted causation" during their deposition testimony. Specifically, Plaintiffs contended that Garner and Barfield "admitted a causal connection between Plaintiffs' termination and their report of illegal activity," meaning that their refusal to remain silent about Hogg's illegal activity was the reason for their termination. The trial court rejected this argument, and so do we. The cited testimony from Assistant Chief Barfield simply states:

Q. All right. Chief, do you agree with me that had the plaintiffs not come forward that Officer Hogg very well may never have been arrested?

A. I agree with that, yes, sir.

Q. Okay. And do you agree with me that the law should encourage employees to come forward?

12

A.     Yes, sir.

This testimony does not establish that Plaintiffs were terminated for reporting illegal activity.

The cited testimony from Chief Garner does not constitute an admission of causation either.  The following exchange occurred during his deposition:

Q.     Okay. And as far -- and at the time they reported this, there was no ongoing investigation about whether or not Michael -- Mr. Hogg had engaged in illegal conduct. Is that correct?

A.     No, there was not.

Q.     And so if they -- had they not come forward, in other words, but for them reporting Michael Hogg, they would not have been terminated. In other words, their termination would never have happened if they hadn't come forward. Is that correct?

. . . .

A.     Their termination wouldn't have been caused if all the information had been brought forward accurately, that -- yes. He -- had he not been arrested or charged, probably not.

Q.     Okay. So but for them coming forward, their terminations would not have been caused. Is that correct?

MS. VAWTER: Object to the form.

A.     Well, it's not just the coming forward. It's in respect to the whole totality of the reporting in a timely manner.

13

Q.      Yeah. I mean, I understand that the City takes the position that -- that -- that the manner of their reporting was not correct. Is that true?

A.      Correct.

Q.      But had they not come forward, they never would have been fired. Correct?

A.      Had they not come forward, Mike Hogg would probably not have been arrested.

Q.      I understand that. Had they not come forward, Mike Hogg might still be employed by the city of Union City. Correct?

A.      I think eventually it would have been found out, but until then, yes.

Q.      We don't know that.

A.      We don't know that.

Q.      And had they not come forward, Mike Hogg would not have been arrested and they would not have been terminated. You agree with that?

A.      Yes.

Chief Garner merely recognized the fact that if Plaintiffs had not reported the information to the TBI, the investigation might not have led to Hogg's arrest and Plaintiffs' terminations. However, Chief Garner's testimony does *not* constitute an "admission of causation" in the sense urged by Plaintiffs. His testimony does not suggest or establish that the City terminated Plaintiffs' employment solely for their refusal to remain silent about illegal activity. Plaintiffs' argument that these witnesses "admitted causation" is without merit.

**B.**

14

Plaintiffs also argued that witnesses for the City provided "inconsistent testimony about the policy that was allegedly violated, creating a credibility dispute" and an issue for resolution by a jury. According to Plaintiffs, because they pointed out "a credibility dispute, not only must the court deny summary judgment, the trier of fact can disregard everything that individual says." For instance, Plaintiffs cited testimony from Chief Garner and Assistant Chief Barfield regarding the City's written reporting policy, which stated that "[m]embers having knowledge of other members violating the laws . . . shall report such violations in writing to the Chief of Police through official channels." Chief Garner testified that officer misconduct was "supposed to be reported through the chain of command in writing up to me." Assistant Chief Barfield simply stated that the report was to be in writing to the chief of police. Another officer testified that "when there is knowledge of an officer that has committed a crime, the supervisor is to notify the chief of police as soon as possible in writing." We do not necessarily deem these statements inconsistent. However, in any event, these inconsistencies do not raise a genuine issue of material fact requiring a trial. Credibility concerns that warrant denying a summary judgment motion must rise to a level higher than normal credibility questions that arise whenever a witness testifies. *Hill Boren, P.C. v. Paty, Rymer & Ulin, P.C.*, No. W2012-00925-COA-R3-CV, 2013 WL 1136540, at *15 (Tenn. Ct. App. Mar. 19, 2013) (citing *Bailey Tool & Mfg. Co. v. Butler*, No. M2009-00685-COA-R3-CV, 2010 WL 2073854, at *7 (Tenn. Ct. App. May 21, 2010)). "'Any other rule would essentially prevent the courts from granting a summary judgment in any case.'" *Id.* (quoting *Bailey*, 2010 WL 2073854, at *7) (quoting *Hepp v. Joe B's, Inc.*, No. 01A01-9604-CV-00183, 1997 WL 266839, at *3 (Tenn. Ct. App. May 21, 1997)). The opponent to the motion for summary judgment cannot merely point out any inconsistency in testimony or concern regarding a witness's credibility to avoid the grant of summary judgment. *Id.* According to our supreme court,

> [T]he party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and ... the opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof.

*Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 863 (Tenn. 1985) (citation omitted).

The policy that Plaintiffs were charged with violating was written in the police department's policy manual, which the officers were required to read and understand. The allegedly conflicting testimony regarding the policy, cited by Plaintiffs, fails to "refute the proof of the moving party in some material portion" or raise some genuine

doubt as to the witnesses' credibility that would justify disregarding their entire testimony. *Lindsey*, 689 S.W.2d at 863. Plaintiffs failed to demonstrate a genuine issue of material fact in response to the City's properly supported motion for summary judgment by simply questioning the witnesses' credibility.

## C.

Plaintiffs also claim they have demonstrated pretext by showing that the City did not fire other police officers who violated the same policies. Plaintiffs claim that the City "did not terminate other officers who engaged in the exact same conduct as the Plaintiffs" but who did not report their suspicions to the TBI.

Once an employer proffers a non-retaliatory reason for the employee's termination, the employee must have a full and fair opportunity to demonstrate that the employer's proffered reason is pretextual and that unlawful retaliation was the true reason for the termination. *Williams*, 465 S.W.3d at 118 (citing *Wilson*, 104 S.W.3d at 50). At this stage, the burden-shifting framework falls away, and the trier of fact is left to determine the ultimate issue of retaliation. *Id.* (citing *Gibson v. City of Louisville*, 336 F.3d 511, 513 (6th Cir. 2003)). "[I]n other words, the question becomes whether the plaintiff has established that it is more likely than not that the employer's proffered reason 'is mere pretext and thus a coverup' for the employer's true retaliatory motive." *Id.* (quoting *Barry v. U.S. Capitol Guide Bd.*, 636 F.Supp.2d 95, 102-03 (U.S.D.C. 2009)). The reasonableness of the employer's decision may be considered only insofar as it illuminates the employer's motivation because the relevant question is not whether the employer's decision was sound but whether it was pretextual. *Id.* at 119. Simply put, "the plaintiff must show that the employer lied about the reason it gave for terminating the plaintiff's employment, in order to mask its true retaliatory motive." *Id.* After taking into account any evidence exposing "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions'" in the employer's proffered explanation, the trial court must decide whether the evidence as a whole gives rise to an inference that the employer's proffered non-retaliatory reason is pretextual. *Id.* at 118 (quoting *Wilson*, 104 S.W.3d at 50-51).

One method of demonstrating pretext is to show that the proffered reason was insufficient to motivate the discharge because other employees who engaged in substantially the same non-protected conduct were not fired. *Id.* at 119. In Plaintiffs'

16

response to the City's motion for summary judgment, Plaintiffs argued that two other officers, Sergeant Wright and Officer Haskins, also knew about Hogg's suspicious conduct but failed to report it. In its order granting summary judgment to the City, the trial court acknowledged Plaintiffs' argument that the city did not fire other employees for violating the policy. However, the trial court found that "any knowledge other city employees had of Officer Hogg's activities was obtained at or near the time the plaintiffs reported such to the city." Plaintiffs challenge this finding on appeal as erroneous. However, the trial court's finding is clearly supported by the evidence cited in Plaintiffs' own response to the motion for summary judgment.

Plaintiffs argued in their response that Sergeant Wright "knew of the illegal activity and never reported it," and they provided citations to deposition testimony from Sergeant Wright, Chief Garner, and Assistant Chief Barfield. According to the cited deposition testimony, Sergeant Wright found out about Hogg's conduct in early November 2011, on November 2 or 3, which was on or around the day Merrell reported it to the TBI. This evidence, cited by Plaintiffs, supports the trial court's finding that "any knowledge other city employees had of Officer Hogg's activities was obtained at or near the time the plaintiffs reported such to the city." The cited testimony does *not* establish that Sergeant Wright engaged in "substantially the same" conduct as Plaintiffs. To the contrary, it establishes that he learned of the suspicious activity around the time it was reported to the TBI in November 2011, while Plaintiffs were aware of Hogg's comments and the subsequent alleged theft of Hogg's four-wheeler for over a year by the time the situation was reported in November 2011. The cited testimony also establishes that Sergeant Wright was disciplined by the police department in the form of a written reprimand because he failed to report the information he learned about Hogg's conduct to the chief of police, even though Merrell reported it to the TBI. The fact that Sergeant Wright received lesser discipline based on his circumstances does not demonstrate that the stated reason for terminating Plaintiffs was pretextual.

Plaintiffs also argued in their response that Officer Haskins was a similarly situated employee who was not terminated. Again, however, the evidence cited by Plaintiffs in response to the motion for summary judgment does not establish that Haskins engaged in substantially the same conduct as Plaintiffs. Haskins said in his deposition that when he learned that Hogg's four-wheeler was stolen, he "automatically assumed, yeah right," and his first thought was, "He probably burned it." However, Haskins testified that he became aware of actual facts indicating that Hogg may have committed a crime when Hogg was discussed at in-service in November 2011. Haskins testified that he reported the situation to his lieutenant that same day and believed that reporting the information "back up the ladder" through his lieutenant, in addition to contacting the TBI, was sufficient. Haskins was interviewed by the TBI during its

investigation.

Again, the City's conduct toward Haskins does not suggest that its stated reason for terminating Plaintiffs was pretextual or insufficient to motivate their discharge. The evidence cited by Plaintiffs failed to establish that Haskins engaged in substantially the same conduct; instead, it established that Haskins learned of information indicating that a crime may have been committed in November 2011, and he reported it to his lieutenant that same day. He also provided information to the TBI during its investigation, like Plaintiffs, and was not terminated from his employment for doing so.

In sum, we conclude that Plaintiffs' response to the motion for summary judgment failed to demonstrate a genuine issue of material fact regarding whether the City's stated reason for their termination was pretextual. Given the testimony cited by Plaintiffs in their response, we cannot say the trial court erred in concluding that any knowledge the other officers had regarding Hogg's activity was obtained at or near the time Plaintiffs reported the information.[4]

## D.

Plaintiffs also emphasize the temporal proximity between their contact with the TBI and their termination. The temporal proximity of an adverse action and a complaint constitutes circumstantial evidence that is pertinent and probative on the issue of causation and retaliatory intent. *Sykes*, 343 S.W.3d at 29 (citing *Allen*, 240 S.W.3d at 822). "[C]lose temporal proximity between a protected activity and an adverse employment action is a fact that an employee may offer to demonstrate that a genuine issue of material fact exists as to the causation element." *Id.* Suspicious timing can be

---

[4]We recognize that Plaintiffs cite additional facts in their brief on appeal in an attempt to demonstrate that Haskins and Wright were similarly situated employees because, according to Plaintiffs' deposition testimony, Haskins and Wright had knowledge of Hogg's suspicious activity earlier than they admitted. However, these additional facts were not cited in Plaintiffs' response to the summary judgment motion. Plaintiffs attached nine full-length depositions as exhibits to their response, but it was not the trial court's responsibility to blindly scour the record to identify any genuine issues of material fact that were not identified or argued in Plaintiffs' response. "In considering whether the trial court erred in granting summary judgment, we will look to the evidence that the parties presented to the trial court at each stage of the summary judgment proceedings to decide whether the parties met their burden of production and whether a genuine issue of fact existed." *Cartwright v. Jackson Capital*, No. W2011-00570-COA-R3CV, 2012 WL 1997803, at *11 n.9 (Tenn. Ct. App. June 5, 2012); *see also Rye*, --- S.W.3d --- , 2015 WL 6457768, at *22 ("The nonmoving party must demonstrate the existence of *specific facts in the record* which could lead a rational trier of fact to find in favor of the nonmoving party.") (emphasis added). The only testimony cited by Plaintiffs in their response supports the trial court's finding on this issue.

indirect evidence of discriminatory intent. *Pierce v. City of Humboldt*, No. W2012-00217-COA-R3CV, 2013 WL 1190823, at *14 (Tenn. Ct. App. Mar. 25, 2013). "As with other facts proffered by the employee in opposition to a summary judgment motion, the court should consider temporal proximity in a light most favorable to the nonmoving party." *Sykes*, 343 S.W.3d at 29. However, "a court's consideration of temporal proximity 'does not exclude the possibility of summary judgment[.]'" *Id.* (quoting *Gossett*, 320 S.W.3d at 786). In *Sykes*, the supreme court specifically rejected the suggestion that, under Tennessee case law, "any plaintiff who can demonstrate close temporal proximity is automatically entitled to a trial on his or her retaliatory discharge claim."[5] *Id.* at 31.

Here, Plaintiffs' circumstantial evidence regarding the temporal proximity of the events does not cast doubt on the City's proffered reason for Plaintiffs' termination. The TBI investigation revealed that Plaintiffs had knowledge of Hogg's suspicious activities for more than a year, and the City terminated Plaintiffs shortly thereafter. Considering the circumstances of this case, the temporal proximity between the Plaintiffs' termination and their contact with the TBI is not sufficient to raise a genuine issue of material fact regarding the element of causation. The City presented undisputed evidence that at least one legitimate reason was part of the motivation for discharging the Plaintiffs. Again, Plaintiffs admitted that Assistant Chief Barfield "honestly believed that Plaintiffs' conduct had violated police department policies for professional conduct and responsibilities, including reporting violations, the code of ethics, cooperation with other law enforcement agencies, and failure to report honestly and accurately all facts pertaining to an investigation." They also admitted that Dillon had final decision making authority over the terminations and that "[she] believed that the Plaintiffs' conduct in failing to come forward in a timely fashion violated an important public trust that is placed on an officer of the law and compromised their integrity as officers."

Under the TPPA, the plaintiff must ultimately establish that retaliation is the "sole" reason for the termination of his or her employment. *Williams*, 465 S.W.3d at 115. The City submitted evidence that Plaintiffs were discharged for at least one legitimate, non-pretextual reason and thereby affirmatively negated the final element of the Plaintiffs' TPPA claim – sole causation. Even viewing all the evidence in the light most favorable to Plaintiffs, a reasonable juror could not conclude that the sole reason for the Plaintiffs' termination was their refusal to conceal or remain silent about Hogg's illegal activity.

---

[5]Likewise, "[a] majority of the federal courts of appeals have affirmatively rejected the proposition that, where the employer has set forth a legitimate, non-discriminatory reason for its action, temporal proximity alone is sufficient evidence of pretext to survive summary judgment." *Gossett*, 320 S.W.3d at 794 (Clark, J., concurring in part and dissenting in part) (citations omitted).

## E.

We now turn to Plaintiffs' argument on appeal that "a legal issue exists regarding whether an employer can implement a policy that has a chilling effect on reporting illegal activities under the Tennessee Public Protection Act." They claim that the City's written reporting policy has "a chilling effect on encouraging employees to report illegal conduct under the TPPA." Plaintiffs argue that the Tennessee Supreme Court rejected such policies in *Williams v. City of Burns* and held that an employer cannot maintain a policy that circumvents an employee's absolute right to report illegal activity. We disagree with Plaintiffs' reading of *Burns* and their characterization of the policy at issue in this case.

At the outset, we note that the written policy in this case *requires* officers having knowledge of other members violating the laws to report such violations in writing to the chief of police through official channels. This policy does not discourage employees from reporting illegal conduct; it encourages and even mandates reporting.

Furthermore, the policy at issue in this case is distinguishable from the policy at issue in *Williams v. City of Burns*. In that case, a police officer reported the chief of police to the mayor and was terminated. 465 S.W.3d at 101. The City claimed that the police officer violated its "chain of command" policy by reporting to the mayor rather than to the chief of police, who was the wrongdoer. *Id.* at 107. The supreme court explained that "'[i]mproperly applied, a chain-of-command policy will undermine fair employment policies.'" *Id.* at 117 (quoting *Fleming v. Corr. Healthcare Solutions, Inc.*, 164 N.J. 90, 751 A.2d 1035, 1040 (2000)). The supreme court had previously held that whistleblower protection is not afforded to an employee who reports wrongdoing only to the wrongdoer, who is already aware of his or her own misconduct, as there has been no exposure of the employer's illegal or unsafe practices. *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 40 (Tenn. 2015). The supreme court explained in *Williams* that "'[t]o discipline an employee for going over the head of a supervisor allegedly involved in illegal . . . workplace activity undermines exactly what the Legislature had in mind when it passed the Whistleblower Act.'" *Williams*, 465 S.W.3d at 117 (quoting *Fleming*, 751 A.2d at 1039). Accordingly, the court held that the employer could not rely on its chain of command policy to satisfy its burden of proffering a non-retaliatory reason for the officer's discharge. *Id.* at 117. In fact, the court explained that the city's evidence that it discharged the officer for speaking to the mayor about the chief's illegal activity amounted to direct evidence of a retaliatory motive, meaning an admission by the city that it retaliated against the officer for engaging in protected conduct. *Id.*

The policy at issue in this case is different. It does not forbid reporting to a higher authority; it requires reporting. *Williams* did not broadly hold or suggest that any employer policy that could potentially have a "chilling effect" on a whistleblower is invalid or that whistleblowers are provided with absolute protection from discipline. To the contrary, when the supreme court cited *Fleming* for its discussion of chain of command policies, the supreme court added the following footnote, which we find particularly instructive here:

> The *Fleming* court added this caveat: "This does not mean that an employer may not fire an employee, even a whistleblower, who is unreasonable in expressing his or her complaints." *Fleming*, 751 A.2d at 1039 (citing as an example of unreasonable behavior a public employee who calls the governor repeatedly late at night to report wrongdoing in a state agency).

*Williams*, 465 S.W.3d at 117 n.24. This recognition by the supreme court undermines Plaintiffs' argument that employers can no longer implement any policy that could have a chilling effect on whistleblowers or potentially impact their absolute right to report illegal activity. Consequently, we reject their argument that the City could not rely on its written reporting policy to demonstrate a legitimate nondiscriminatory reason for their termination.

We also reject Plaintiffs' argument that this case involves direct evidence of a retaliatory motive, constituting direct evidence of retaliation, like that in *Williams*. Direct evidence does not require the fact finder to draw any inferences in order to conclude that unlawful discrimination or retaliation motivated the employer's decision. *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 609 (Tenn. Ct. App. 2007); *Paschall v. Henry Cnty. Bd. of Educ.*, No. W1999-0070-COA-R3-CV, 2000 WL 33774557, at *4 (Tenn. Ct. App. June 2, 2000). Direct evidence may include an acknowledgment by the employer of discriminatory intent. *Paschall*, 2000 WL 33774557, at *5. In the *Williams* case, the city admitted that it discharged the officer for speaking to the mayor about the chief's illegal activity, which allegedly violated the chain of command policy, but constituted protected conduct under the TPPA. By comparison, the record in this case contains no direct evidence that the City terminated Plaintiffs *because* they reported to the TBI or because they engaged in any other protected conduct.

## V. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed and remanded. Costs of this appeal are taxed to the appellants, David Jones, Randy O'Dell, and Ashley Thompson Merrell, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE

22