751 A.2d 1035

BARBARA R. FLEMING, PLAINTIFF–APPELLANT, v. CORRECTIONAL HEALTHCARE SOLUTIONS, INC., JENNIFER MIERS AND SALLY SIMPSON, DEFENDANTS–RESPONDENTS, AND JANE DOE AND ROBERT ROE, DEFENDANTS.

Argued March 14, 2000—Decided June 7, 2000.

*John F. McDonnell,* argued the cause for appellant (*Rand, Algeier, Tosti & Woodruff,* attorneys).

*Alan S. Gold,* a member of the Pennsylvania bar, argued the cause for respondents (*McElroy, Deutsch & Mulvaney,* attorneys; *Joseph P. LaSala,* on the brief).

PER CURIAM.

This appeal concerns the Conscientious Employee Protection Act (CEPA or Whistleblower Act), *N.J.S.A.* 34:19-1 to -8. The central question in the appeal is the extent to which an employer can dictate to its employees the manner in which complaints of illegal workplace conduct can be made. More specifically, can an employer fire an employee on the basis of "insubordination" because the employer has directed that the complaints be submitted to a lower-level supervisor who had previously ignored the same complaints?

Plaintiff contends that CEPA permits employees to submit legitimate CEPA complaints to any individual who falls within the definition of "supervisor" as defined in *N.J.S.A.* 34:19-2(d). No

employee can be lawfully terminated for submitting a CEPA complaint to "any individual with an employer's organization who has the authority to direct and control the work performance of the affected employee, who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains, or who has been designated by the employer on the notice required [by] this act." *Ibid.*

I.

Prior to April 1, 1996, the State of New Jersey employed plaintiff, Barbara R. Fleming, and defendants Sally Simpson and Jennifer Miers as nurses at the Edna Mahan Correctional Facility, a prison for women.

In April 1996, the Department of Corrections "privatized" medical services at the Facility and hired an outside corporation to provide those services. In turn, that private corporation contracted with Correctional Healthcare Solutions, Inc. (CHS) to deliver the services. Fleming, Simpson and Miers were retained by CHS to work as nurses at the Facility. After the takeover, Simpson was employed as the "Evening Charge Nurse" and was Fleming's immediate supervisor. Miers was employed with CHS initially as Charge Nurse, became a nursing supervisor from mid-May 1996 until June 1996, and then in late June or early July 1996 became CHS's Health Services Administrator.

On March 12, 1996, the Assistant Commissioner of the Department of Corrections sent a memorandum to all administrators and superintendents setting forth the new policies and procedures to be implemented as a result of the passage of *N.J.S.A.* 30:7E-1 to -6. That statute requires inmates to pay a nominal fee for medical services and medications. *N.J.S.A.* 30:7E-2. Pursuant to the Commissioner's memorandum, all inmates requesting medical services or medications were to be required to complete a medical request form (Form HS-01). All inmates were to be assessed a co-payment of $5.00 for medical services and $1.00 for medications.

Form HS–01 had to be completed in order to implement the co-payment.

After CHS took over, Fleming observed that medical services and medications were being provided to inmates who had not completed the required co-payment form and thus were not charged the required co-payment. She may appear to some to be a rarity in public life (a stereotype of state employees that is unjustified)—a worker who tries to *save* the taxpayers' money, not waste it. Beginning in late May or early June 1996, Fleming complained to her boss, Simpson, on several occasions about CHS's failure to enforce this law. Simpson and Miers acknowledge that Fleming made these complaints. It is also undisputed that these HS-01 co-payment forms were often not completed. Fleming also complained to Simpson that CHS employees were providing medications to inmates under expired physician orders, which she believed to be in violation of *N.J.S.A.* 2C:21–20, *N.J.S.A.* 45:9–22, and the Federal Food, Drug and Cosmetic Act, 21 *U.S.C.* § 301 to § 397.

The courts below found that Fleming had presented evidence from which a jury could find that her belief that illegal conduct was occurring was objectively reasonable. *See Higgins v. Pascack Valley Hosp.* 158 *N.J.* 404, 424, 730 *A.2d* 327 (1999) (holding "that the CEPA prohibits an employer from taking retaliatory action against an employee who has a reasonable basis for objecting to a co-employee's activity, policy, or practice covered by *N.J.S.A.* 34:19–3"). However, each court found that Fleming's whistle-blowing was not protected. In an unpublished opinion, the Appellate Division held that plaintiff did "not produce[ ] sufficient evidence to establish [that] her termination was a result of her complaining about CHS violations, and not due to her refusal to follow instructions from Miers regarding the submission of said complaints (through the chain of command) and for her refusal to follow orders in the dispensing of medication." We granted certification primarily to consider the chain-of-command issue. 162 *N.J.* 486, 744 *A.2d* 1208 (1999).

## II.

Because the case arises on a motion for summary judgment, we must view the controverted facts in the light most favorable to plaintiff. Here is the time line of the events as plaintiff states it:

July 2, 1996 Fleming sent a letter to Donald Moore, then the Director of the Medical Department at the facility for CHS. Fleming's letter complained about, among other things, the dispensing of medications by CHS employees to inmates without valid physician orders and the failure to complete Form HS-01 when providing services or medications to inmates.

July 3, 1996 Miers returned the letter to Fleming with the following handwritten note attached: "Dear Barb: This should first go to Sally [Simpson] then Sally should bring it to me and then I'll bring it to Don."

July 5, 1996 Fleming forwarded to Miers a letter entitled "Problems." This letter set forth the identical complaints identified in Fleming's July 2, 1996 letter to Moore. Fleming asserted that while she was instructed to send the letter to Simpson first, she did not do so because she believed she had a duty to bring these problems to the attention of the highest person in command and that her prior oral complaints to Simpson had not produced results.

July 12, 1996 Miers fired Fleming. Miers told Fleming that the *"most important thing"* was *"this letter,"* referring to the July 5, 1996, letter Fleming had sent to Miers. Miers told Fleming that she had failed to follow the "chain of command." Miers said that Fleming's conduct constituted "willful disobedience" and that she was terminated. Miers told Fleming, for the first time, that she had received a negative performance review from Simpson. [Emphasis added.]

Plaintiff contends that this is a retaliatory firing in violation of CEPA. Defendant contends that it fired her for "insubordination" in reporting misconduct to a higher-up in combination with poor job performance exacerbated by her refusal to follow direct orders.

## III.

CEPA is remedial legislation. *Barratt v. Cushman & Wakefield, Inc.,* 144 *N.J.* 120, 127, 675 *A.*2d 1094 (1996). Its purpose is "to protect employees who report illegal or unethical workplace activities." *Ibid.* It is also intended to "encourage employees to report illegal or unethical workplace activities and to discourage ... employers from engaging in such conduct." *Abbamont v. Piscataway Township Bd. of Ed.,* 138 *N.J.* 405, 431, 650

*A.2d* 958 (1994). It is to be construed liberally to achieve its important social goal.[1]

 CEPA grants to employees the right to submit complaints of illegal or unethical workplace conduct to any individual defined as a "supervisor" in *N.J.S.A.* 34:19–2(d). CEPA provides, in part, that

> [a]n employer shall not take any retaliatory action against an employee because the employee ... [d]iscloses, or threatens to disclose to a *supervisor* . . [a] policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law....
>
> [<em>N.J.S.A.</em> 34:19–3 (emphasis added).]

Importantly, "supervisor" is defined as

> *any* individual with an employer's organization who has the authority to direct and control the work performance of the affected employee, who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains, or who has been designated by the employer on the notice required under Section 7 of this act.
>
> [<em>N.J.S.A.</em> 34:19–2(d)(emphasis added).]

Thus, "supervisor" is broadly defined. It includes, among others, Miers, to whom Fleming submitted her complaint in early July 1996.

 CHS has no right to limit CEPA's definition of "supervisor" by mandating that its employees submit CEPA complaints to their immediate supervisor. Certainly, it could not punish Fleming for submitting her protected complaints to Miers, an individual who fell within CEPA's definition of "supervisor."

---

1 New Jersey's whistleblower statute, the Conscientious Employee Protection Act (CEPA), was passed by the Legislature in 1986. Because CEPA is a relatively new law, the basic contours of the statute are still being mapped out as whistleblower cases wind their way up the appellate ladder....

 CEPA prohibits employees from retaliating against employees for "blowing the whistle" on (1) possible violations of the law, (2) possible improper quality of patient care in the health care industry, or (3) possible violations of any clear mandate of public policy concerning the public health, safety, or welfare or the protection of the environment.

[Christopher P. Lenzo, *The Changing Contours of New Jersey Whistleblower Law, New Jersey Lawyer, the Magazine,* April, 1999 at 51 (footnotes omitted).]

█ This does not mean that an employer may not fire an employee, even a whistleblower, who is unreasonable in expressing his or her complaints. For example, a state employee who repeatedly called the Governor at the Governor's residence late at night to report violations of law at a state agency could justly be said to be insubordinate if requested not to do so. But to discipline an employee for going over the head of a supervisor allegedly involved in illegal or unethical workplace activity undermines exactly what the Legislature had in mind when it passed the Whistleblower Act. The most that can be made of a chain-of-command defense is that it might be raised as a valid nondiscriminatory reason for an employee's firing, that, like any other defense would have to be resolved by a factfinder. *See McDaniel v. Temple Indep. Sch. Dist.,* 770 *F.*2d 1340, 1348–49 (5th Cir.1985)(advancing "arguments in support of [plaintiff's] contention that . . . court erred in concluding that her unfavorable job evaluations were not motivated by a discriminatory or retaliatory intent"). Consider our most recent decision in *Bergen Commercial Bank v. Sisler,* 157 *N.J.* 188, 723 *A.*2d 944 (1999), involving discrimination against a bank officer because of his youth. There the employer asserted that it was not discriminating against the employee but rather that it fired him because he was unqualified for the job. *Id.* at 197, 723 *A.*2d 944. We said that was a question for the factfinder. *Id.* at 221, 723 *A.*2d 944.

Improperly applied, a chain-of-command policy will undermine fair employment policies. *See Gares v. Willingboro Township,* 90 *F.*3d 720, 724 (3rd Cir.1996)(describing municipality's chain-of-command procedure as trapping plaintiff between "the Scylla of enduring [a supervisor]'s offensive conduct and the Charybdis of possible termination for violating the chain-of-command rules" by reporting supervisor's conduct to higher authority).

In the analogous context of disciplining public employees for speech, the chain-of-command defense has often been raised but often rejected.

For example, if the employee is speaking out against the corruption of his or her supervisors, it may be reasonable to forego the internal complaint mechanism of the department because it would be a futile gesture. *Cf. Brockell v. Norton*, 732 *F.*2d 664, 668 (8th Cir.1984) (allegations warranted going around normal chain of command). However, where an adequate internal complaint mechanism is established, the employee's failure to use the complaint procedure can be considered in determining whether the speech was reasonable.

The seriousness of the issue of public concern should also be considered in determining whether the speech was reasonable. The more serious the issue, the greater latitude that should be given the public employee to speak out.

[*Johnsen v. Independent Sch. Dist. No. 3*, 891 *F.*2d 1485, 1490 n. 4 (10th Cir.1989).]

In *Czurlanis v. Albanese*, 721 *F.*2d 98 (3 rd Cir.1983), the Third Circuit reviewed an employee's claim that he was wrongly terminated for failing to follow the employer's "chain-of-command" policy when making "whistleblowing" complaints protected by the First Amendment. In that case, the public employer had a "chain-of-command" policy precluding employees from addressing complaints to the County Board of Chosen Freeholders without first bringing the complaint to the attention of those officials "ultimately responsible." *Id.* at 105. The court held "that such a policy cannot be used to justify the retaliatory action ... under the rubric of the County's interest in promoting the efficiency of public service." *Ibid.*

A policy which would compel public employees to route complaints about poor departmental practices to the very officials responsible for those practices would impermissibly chill such speech.... It would deter "whistleblowing" by public employees on matters of public concern. It would deprive the public in general and its elected officials in particular of important information about the functioning of government departments.

[*Id.* at 106 (citation omitted).]

That analysis should apply here. The holdings below that allow firing for insubordination when a whistle-blowing employee side-steps an involved supervisor contradict the express language of CEPA and its broad remedial purpose. Fleming's act of communicating her complaints to Miers involved protected conduct as a matter of law. Fleming claims that despite the difficulty of working in a prison, she remained the kind of person who "[a]t the end of every hard earned day ... [found] some reason to believe."

Bruce Springsteen, *Reason to Believe, Nebraska* (Sony/Columbia 1982). We are not so certain that plaintiff is that ideal employee, but "insubordination" for violating a chain of command cannot be relied on to justify her termination.

## IV.

## A.

The more difficult question is whether, if "insubordination" cannot be relied on as the basis for her discharge, plaintiff may still proceed with her claim despite the other nondiscriminatory reasons for her firing including a charge that she refused to provide medication to inmates located in the housing units. Plaintiff will argue that this was a mixed-motive case in which the burden is shifted to defendant to justify the employment decision. The Appellate Division has succinctly stated the analysis applied when several reasons for an employment decision are stated.

The difference between a *McDonnell Douglas* or "pretext" case and a *Price Waterhouse* or "mixed-motive" case has been explained in the following manner:

An employment discrimination case may be advanced on either a pretext or "mixed-motives" theory. In a pretext case, once the employee has made a *prima facie* showing of discrimination, the burden of going forward shifts to the employer who must articulate a legitimate, nondiscriminatory reason for the adverse employment decision. If the employer does produce evidence showing a legitimate, nondiscriminatory reason for the discharge, the burden of production shifts back to the employee who must show that the employer's proffered explanation is incredible. At all times the burden of proof or risk of non-persuasion, including the burden of proving "but for" causation or causation in fact, remains on the employee. In a "mixed motives" or *Price Waterhouse* case, the employee must produce direct evidence of discrimination, i.e., more direct evidence than is required for the *McDonnell Douglas/Burdine* [*Texas Department of Community Affairs v. Burdine*, 450 *U.S.* 248, 101 *S.Ct.* 1089, 67 *L.Ed.*2d 207 (1981) ] prima facie case. If the employee does produce direct evidence of discriminatory animus, the employer must then produce evidence sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision. In short, direct proof of discriminatory animus leaves the employer only an affirmative defense on the question of "but for" cause or cause in fact.

[*Starceski v. Westinghouse Electric Corp.*, 54 *F.*3d 1089, 1096 n. 4 (3d Cir.1995) (citations omitted).]

The distinction between a pretext and a mixed-motive case lies in the directness of proof of discrimination required by the plaintiff. *Starceski, supra,* 54 *F.*3d at

1097. In a mixed-motive case, "direct evidence of discriminatory animus leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it." *Ibid.*

. . . .

"At a bare minimum, a plaintiff seeking to advance a mixed-motive case will have to adduce circumstantial evidence 'of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Griffiths v. CIGNA Corp.,* 988 *F.*2d 457, 470 (3d Cir.), *cert. denied,* 510 *U.S.* 865, 114 *S.Ct.* 186, 126 *L.Ed.*2d 145 (1993), overruled on other grounds, *Miller v. CIGNA Corp.,* 47 *F.*3d 586 (3d Cir.1995) (in banc ) (citation omitted).

[*Jackson v. Georgia–Pacific Corp.,* 296 *N.J.Super.* 1, 18–19, 685 *A.*2d 1329 (1996).]

We are satisfied from our assessment of the evidence that the directness of proof of discrimination in this case does not make this a mixed-motive case. This is a *McDonnell Douglas* pretext case.

■ In order ultimately to prevail, plaintiff must prove that retaliatory intent motivated her employer. However, the "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional [retaliation]. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional" retaliatory action. *St. Mary's Honor Center v. Hicks,* 509 *U.S.* 502, 511, 113 *S.Ct.* 2742, 2749, 125 *L.Ed.*2d 407 (1993).

## B.

Has plaintiff made a *prima facie* case? Fleming's initial evaluation as a CHS employee, dated May 30, 1996, indicates no problems with her performance and states that her performance "meets expectations." Even Simpson testified that she had "no problems" with Fleming's performance prior to May 30, 1996.

Fleming also presented substantial evidence disputing that the June 1996 evaluation authored by Simpson was the basis for her

firing. Plaintiff's testimony is sufficient to create a genuine dispute about that issue. *Weldon v. Kraft, Inc.*, 896 *F*.2d 793, 800 (3rd Cir.1990) (noting that "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion"); *Graham v. F.B. Leopold Co., Inc.*, 779 *F*.2d 170, 173 (3rd Cir.1985) (observing that plaintiff's deposition testimony could suffice to create a genuine dispute about material issue); *Waldron v. SL Indus., Inc.*, 56 *F*.3d 491, 501 (3rd Cir.1995) (stating that "Supreme Court has made it clear that self-serving testimony may be utilized by a party at summary judgment")(citing *Celotex Corp. v. Catrett*, 477 *U.S.* 317, 324, 106 *S.Ct.* 2548, 2553, 91 *L.Ed.*2d 265 (1986)). Fleming's rebuttal evidence is sufficient to dispute the legitimacy of any assertions of poor performance.

Fleming also submitted evidence, in addition to her own proffered testimony, from which a jury could find that defendant's assertions of a poor performance were pretextual. Carla Streano, a nurse who worked with Fleming under Simpson, described her conversations with Simpson. Prior to Fleming's termination, Simpson informed Streano that "I'm not giving anybody a bad evaluation. I don't have anything bad to say about anybody," including Fleming. When Streano later learned of Simpson's negative evaluation of Fleming, she confronted Simpson about her prior inconsistent statement. Simpson responded: "We all need our jobs." Viewing this testimony in the light most favorable to Fleming, a jury could infer that Simpson's negative evaluation of Fleming was a pretext designed to cover up CHS's retaliation against Fleming for blowing the whistle on its sloppy and illegal practices.

 Because the lower court treated this case as one in which violation of the chain of command was a valid basis for discharge, we should remand the matter to the Law Division to determine whether plaintiff has stated an actionable claim. The Law Division must reconsider the case in light of the principles

stated herein and any further proofs that the parties may submit. And that inquiry should proceed in accordance with the standard set forth in *Brill v. Guardian Life Insurance Co.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995). As stated in *Brill*, the fundamental question is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Id.* at 533, 666 *A.*2d 146 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 251–52, 106 *S.Ct.* 2505, 2512, 91 *L.Ed.*2d 202, 214 (1986)). Those principles provide a guide to dispose of CEPA claims. *See Regan v. New Brunswick*, 305 *N.J.Super.* 342, 356, 702 *A.*2d 523 (App.Div.1997)(holding that plaintiff was "entitled to all inferences that may have been drawn in his favor"); *Keelan v. Bell Communications Research*, 289 *N.J.Super.* 531, 536, 674 *A.*2d 603 (App.Div.1996)(concluding that the existence of genuine material issues "precluded a grant of summary judgment").

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for further proceedings in accordance with this opinion.

VERNIERO, J., dissenting.

To the extent that the Court holds that an employee may not be lawfully discharged for blowing the whistle on a supervisor by lodging a CEPA complaint outside of the employer's chain-of-command structure, I fully agree. CEPA would make little sense if it required conscientious employees to disclose alleged wrongdoing to the wrongdoer, especially when the wrongdoer is the employee's immediate boss.

However, that is not this case. Plaintiff twice broke the chain of command prior to her discharge. The first time, on July 2, 1996, she sent a memorandum entitled "Variety of Pecky Problems" to Donald Moore, then her department director. That memorandum contained no explanation of why plaintiff bypassed the normal procedure, which required that the memorandum be sent to her immediate supervisor, Sally Simpson. In fact, it did

not reference Simpson at all. Jennifer Miers, then plaintiff's intermediate supervisor, returned the memorandum to plaintiff with this note: "Dear Barb, This should first go to Sally [Simpson]—then Sally should bring it to me and then I'll bring it to Don [Moore]."

The second time, just three days later, on July 5, 1996, plaintiff bypassed Simpson by resubmitting her list of complaints directly to Miers. In that memorandum, plaintiff explained the breach of protocol by stating: "I see no reason to submit these through Sally, since they are areas over which she has very little input or control." Nowhere in that second memorandum does plaintiff state that Simpson is a wrongdoer or responsible for any of the matters about which plaintiff is complaining.

It was only at her deposition, well after her discharge and the commencement of this suit, that plaintiff identified Simpson for the first time as "the worst offender on our shift." That statement, made during the course of litigation, is a bare allegation unsupported by plaintiff's earlier memoranda. Stated differently, the record contains no foundational fact to support the proposition that plaintiff bypassed Simpson because the supervisor was specifically engaged in wrongdoing. *Cf. Caputo v. Nice–Pak Prods., Inc.,* 300 *N.J.Super.* 498, 506, 693 *A.*2d 494 (App.Div.) (upholding directed verdict because "considering the absence of any corroboration of plaintiff's own self-serving testimony, a reasonable jury could not have found for plaintiff . . ."), *certif. denied,* 151 *N.J.* 463, 700 *A.*2d 876 (1997).

I do not believe that CEPA was intended to abrogate this Court's sound instruction "that when the evidence 'is so one-sided that one party must prevail as a matter of law,' the trial court should not hesitate to grant summary judgment." *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995) (citation omitted). Moreover, "an adverse party may not rest upon the mere allegations or denials of the pleading . . . [to show] that there is a genuine issue for trial." *R.* 4:46–5.

Nor do I believe that CEPA was intended to inoculate employees who are insubordinate or poor performers. According to defendant's personnel records, plaintiff had to be directed "on numerous occasions" to return to her unit to finish dispensing medications to inmates. By fair inference, she was not doing her job, at least in the minds of her supervisors. In a prison setting, failure to do one's job, especially the failure to administer proper medical care to inmates, can have dire consequences.

I agree with the Appellate Division that:

[P]laintiff has not produced sufficient evidence to establish her termination was a result of her complaining about CHS [defendant] violations, and not due to her refusal to follow instructions from Miers regarding the submission of said complaints and for her refusal to follow orders in the dispensing of medication.

. . . .

[T]he record contains sufficient evidence of plaintiff's poor job performance, both prior to and after CHS's takeover. Plaintiff, in her deposition testimony, admitted numerous disciplinary actions taken against her while she was an employee of the State, including a ten-day suspension for insubordination. In addition, plaintiff's testimony outlining her views regarding the dispensing of medication to an inmate without the inmate having filled out the co-pay form supports the June 30, 1996 observations by Simpson about plaintiff's expectation of inmates and her interpersonal skills. When asked whether she believed inmates should be cut off from their medication for not having completed the co-pay form, plaintiff responded:

A: Absolutely.

Q: What happens to the inmate that gets cut off from the medication and gets sick and dies?

A: Same thing that happens to me if I don't call my physician and ask for a refill, I don't get it.

We recently observed that "[t]he overriding policy of ... CEPA ... is to protect society at large." *Cedeno v. Montclair State Univ.*, 163 *N.J.* 473, 478, 750 *A.*2d 73 (2000). I fail to see how society is protected by shielding a nurse who expresses a willingness to cut off medication to persons under her care. In my view, the Legislature did not intend CEPA for that purpose. Instead, it is the refusal to administer medicines to inmates that may be contrary to law. *See N.J.S.A.* 30:7E–5 ("[N]o inmate shall be denied ... prescription or nonprescription drugs or medicine ... because that inmate is unable to reimburse the State or county for the costs of those services, drugs or medicines.").

The Court should not hold that, for the first time during the course of litigation, a litigant may add to or revise her own earlier memoranda and thereby create a triable issue of fact to survive summary judgment. The lower courts had a good sense of this suit and we should accept their findings. *Brill, supra,* 142 *N.J.* at 541, 666 *A.*2d 146 (observing that we should "encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves").

I would affirm the judgment of the Appellate Division substantially for the reasons expressed in the opinion below.

Chief Justice PORITZ joins in this opinion.

*For affirmance*—Chief Justice PORITZ and Justice VERNIERO—2.

*For reversal and remandment*—Justices O'HERN, STEIN, COLEMAN, LONG and LaVECCHIA—5.