NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5315-14T4

JAMES MONTAG,

 Plaintiff-Appellant,

v.

BOROUGH OF HO-HO-KUS, STEVEN
SHELL, individually and in his
official capacity as Councilman
for the Borough of Ho-Ho-Kus,

 Defendants-Respondents.
_________________________________________________

 Argued April 25, 2017 – Decided August 21, 2017

 Before Judges Espinosa, Suter, and Grall.

 On appeal from the Superior Court of New
 Jersey, Law Division, Bergen County, Docket
 No. L-2077-13.

 Charles J. Sciarra argued the cause for
 appellant (Sciarra & Catrambone, LLC,
 attorneys; Mr. Sciarra and Matthew R.
 Curran, of counsel and on the briefs).

 Mary C. McDonnell argued the cause for
 respondents (Pfund McDonnell, PC, attorneys;
 David T. Pfund, of counsel; Ms. McDonnell,
 of counsel and on the brief).

PER CURIAM
 Plaintiff James Montag (Montag) filed a complaint charging

defendants, Borough of Ho-Ho-Kus (Borough) and Councilman Steven

Shell (Shell), with violations of the Law Against Discrimination

(LAD), N.J.S.A. 10:5-1 to -42. Montag contended defendants

failed to reasonably accommodate his disability and terminated

his employment because of it. N.J.S.A. 10:5-4.1. He appeals a

July 10, 2015 order denying his motion for a spoliation

inference without prejudice and a July 24, 2015 order granting

defendants summary judgment on his LAD claims.

 "In reviewing a grant of summary judgment, 'we apply the

same standard governing the trial court—we view the evidence in

the light most favorable to the non-moving party.'" Steinberg

v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 349-50 (2016) (quoting

Qian v. Toll Bros. Inc., 223 N.J. 124, 134-35 (2015)). When the

evidence and "all legitimate inferences therefrom favoring the

non-moving party, would require submission of [a plaintiff's

claims] to the trier of fact," the defendants are not entitled

to summary judgment. Id. at 366-67 (quoting R. 4:46-2(c)). To

prevail, defendants must show entitlement to judgment "as a

matter of law." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014).

 Applying those standards without giving Montag the benefit

of a spoliation inference, we conclude defendants were not

entitled to summary judgment, reverse and remand for further

 2 A-5315-14T4
proceedings.1 Because Montag's motion for a spoliation inference

was denied without prejudice, there is no reason to address it.

 I.

 Consistent with the standard of review, we state the facts

in the light most favorable to Montag. Montag worked for the

Borough for nineteen years before the Borough terminated his

employment in 2012. He started in 1993 as a repairman/laborer

in the Department of Public Works (DPW) and subsequently served

as a mechanic, foreman and assistant superintendent. In April

2010, the Borough separated responsibility for roads, building

and grounds and responsibility for water and sewer. Thereafter,

Montag served as the superintendent of the Borough's Water and

Sewer Department (WSD). Montag's co-worker, Jeffrey Plattman,

was assigned equivalent responsibility for roads, buildings and

grounds.

 Montag reported directly to Donald Cirulli, the Borough's

Business Administrator and Human Resources Director. Defendant

Councilman Steven Shell, who took office in January 2012 and

served as Commissioner of WSD and Assistant Commissioner of DPW,

was the Council's liaison with those departments.

1
 The record was adequate to withstand defendants' motion for
summary judgment without affording Montag an inference based on
deleted e-mails.

 3 A-5315-14T4
 According to Shell, Montag and Plattman accomplished their

work with six or seven employees who reported to both

superintendents, and all of them "pitched in to help each

other." Shell had no problems with Montag's work and was not

aware of any complaints about his abilities, performance or

professionalism. Shell recalled Montag doing well when

explaining the importance of water conservation to members of

the Council and public. Similarly, Cirulli was not dissatisfied

with Montag's performance.

 The circumstances leading to Montag's termination and this

litigation involve Montag's obligation to report to State and

local officials. The Borough's water system consists of wells

from which the Borough pumps, tests, treats and distributes

water, and its sewer system collects and transports wastewater

for treatment elsewhere. These systems for "wastewater

collection," "water supply" and "water treatment" are subject to

the "Water Supply and Wastewater Operators' Licensing Act" (the

Act), N.J.S.A. 58:11-64 to -73, and implementing regulations,

N.J.A.C. 7:10A, which the Commissioner of the Department of

Environmental Protection (DEP) administers and enforces.

N.J.S.A. 58:11-65 (defining the terms), -66 to -69

(classification of the systems and corresponding licenses), -70

 4 A-5315-14T4
(license suspension and revocation), -71 (violations, injunctive

relief and penalties).

 "Every system" covered by the Act must "be operated and

maintained by at least one licensed operator." N.J.S.A. 58:11-

66(a) (emphasis added). DEP regulations provide criteria for

classifying the systems, 1 to 4, and the corresponding licenses.

N.J.A.C. 7:10A-1.14. The Borough's systems require a W-2

license for the water supply system, a T-2 license for water

treatment and a C-2 license for the wastewater collection

system. See N.J.A.C. 7:10A-1.10(a)(2)-(4).

 Montag had all three licenses by early 2000, and he first

served as the Borough's "licensed operator" in May 2010. Prior

to that, Montag was available to back-up the licensed operator.

 Under the Act, the "licensed operator" is individually

responsible for the systems. The Act defines a "licensed

operator" as "a licensee approved by [DEP] . . . who is actively

involved in and responsible for the operation, maintenance, and

effectiveness of the system . . . ." N.J.S.A. 58:11-65(c)

(emphasis added). And, the regulation provides that the

"licensed operator shall be in charge of the operation of the

system." N.J.A.C. 7:10A-1.10(b).

 A licensed operator who violates the Act or regulations is

subject to license suspension or revocation and monetary

 5 A-5315-14T4
penalties. N.J.S.A. 58:11-70 to -71. Through the regulations,

the owner of the system, in this case the Borough, is also

subject to sanctions.

 DEP regulations establish the "minimum" duties of licensed

operators. For example, licensed operators must "immediately

report any system deficiencies, breaks, breakdowns, problems,

bypasses, pump failures, occurrences, emergencies, [and]

complaints," to the system's "owner," the Borough in this case.

N.J.A.C. 7:10A-1.12(b); see N.J.A.C. 7:10A-1.2 (defining owner

to include a municipality that controls a system). In addition,

the licensed operator must monitor system components and

collect, or oversee collection of, samples and tests of those

samples. N.J.A.C. 7:10A-1.12. DEP employees conduct regular

and unannounced inspections of the systems components and

records to ensure compliance, and one of the licensed operator's

duties is to assist the system-owner's compliance.

 The regulations stress the need for the availability of a

licensed operator. N.J.A.C. 7:10A-1.10(f) provides:

 Any time the licensed operator is unavailable
 to cover the system for which he or she is the
 licensed operator, the owner shall obtain the
 services of a licensee holding a license not
 more than one class lower than the
 classification required for the operation of
 the system to cover the system during the
 unavailability of the licensed operator.

 6 A-5315-14T4
 In Montag's view, he was required to be available "24/7."

John Zuzeck was the Environmental Specialist Inspector employed

by DEP to oversee several systems, including the Borough's

systems. In that capacity, Zuzeck oversaw Montag's work and was

deposed in connection with this litigation.

 According to Zuzeck, the Borough did not have an employee

qualified to cover when Montag was unavailable. His co-worker,

Plattman, had only one of the three licenses required to fill-

in, a W-1. Zuzeck acknowledged, however, that DEP would accept

Plattman as substitute but only on a short-term basis. Zuzeck

also indicated the issue of extended leaves had arisen several

times during his ten years' service in various municipalities,

and he explained that the owners of those systems obtained

coverage by qualified substitutes.

 In addition to requiring substitutes, the regulations

demonstrate the importance of having a licensed operator

available at all times by requiring two weeks' advance notice of

a licensed operator's withdrawal of his or her services as

licensed operator. In pertinent part, N.J.A.C. 7:10A-1.10

provides:

 (i) Licensed operators shall notify [DEP's]
 Examination and Licensing Unit at least two
 weeks prior to changing their positions or
 employment.

 7 A-5315-14T4
 (j) The owner of a system employing a new
 licensed operator shall notify, in writing,
 the Examination and Licensing Unit of the
 name of the new licensed operator within two
 weeks after the licensed operator begins his
 or her employment.

Zuzeck did not recall directing the Borough to make arrangements

for coverage in advance to anticipate an event requiring

prolonged absence of the licensed operator. Cirulli, however,

admitted DEP had "suggested that it would be good to have a

backup" but indicated it was not "absolutely necessary."

According to Montag, DEP was "after the Borough" to have back-

up. Prior to Montag's appointment as "licensed operator," the

Borough had at least one employee qualified to substitute in the

event of an extended leave.

 In any event, the Borough did not have any arrangement for

coverage in place when Montag took ill in the summer of 2012.

On July 20, 2012, Montag had a CAT scan that revealed an

incisional hernia. Thereafter, Montag wore a midsection brace

to work. He and Cirulli had several casual conversations about

his health. Cirulli acknowledged that before making a formal

request for extended leave, Montag mentioned having "a hernia

[that] was causing him some discomfort" and his likely need for

at least six weeks off.

 8 A-5315-14T4
 On either August 27 or 31, Montag went to Cirulli's office

and told him his pain had increased to the point that he could

barely stand up, and he had to take care of the hernia and would

need at least six weeks to recover. Montag, who had been

diagnosed with a chronic disease about twelve years earlier,

also told Cirulli recent blood work showed signs of liver

failure.

 By Montag's account Cirulli responded by asking, "Well, how

can we get you out of here now?" Montag asked Cirulli what he

meant, and Cirulli mentioned buying up Montag's sick and

vacation time and getting someone else to do Montag's job.

Montag told Cirulli he was there to discuss his need for medical

leave for at least eight weeks, and possibly longer, if he had

other problems to address.

 Cirulli, who commonly discussed medical conditions with

employees in his role as director of human services,

acknowledged Montag told him about "imminent surgery" and

possible liver problems, but he said Montag left everything up

in the air.

 Cirulli admitted telling Montag the leave he sought seemed

long for hernia surgery and telling Montag he knew people who

"were back to work in two or three weeks" after such surgery.

According to Cirulli, Montag also indicated he might not come

 9 A-5315-14T4
back but his information was too vague to allow Cirulli to

"operate," presumably meaning to do his job. Cirulli also

claimed to have told Montag he was sorry he had a problem when

Montag mentioned liver problems.

 Cirulli said if he "knew [Montag] would be out for a great

length of time, especially recovering from surgery, [he] would

have to make other arrangements and get somebody in to cover

him." He further admitted telling Montag it could be the end of

his career and asking Montag how he could assist "in

effectuating that." Cirulli elaborated on his contribution to

that dialog:

 [I]f you think you're not going to come back
 let me know now and we can work something out
 whereby you could be paid for any of your
 unused vacation days now and then we'll be
 clear to move ahead and do whatever we have
 to do in the way of hiring someone new or
 making an interlocal agreement with another
 town.

 There was no question that Montag had sufficient accrued

vacation and sick time to cover leave until the end of the year.

And, Cirulli acknowledged he understood that Montag had

responsibilities to DEP that he would have to meet even if on

sick leave and that DEP could hold him accountable for

violations that took place while he was on sick leave. He

indicated that he thought Montag could do that without being on

 10 A-5315-14T4
site, but he recognized that Montag could not phone in his

signature.

 Between August 27 and 31, Montag took action to give DEP

notice of his inability to serve as the Borough's licensed

operator. On August 27, he prepared a "Licensed Operator in

Charge Employment Notification Form," which in his view was in

compliance with the requirement for two weeks' notice. He

completed a section of the form stating, "This is a notification

that on 8/31/12 I shall no longer be the operator in charge at

[the Borough's water facility]." (Emphasis added). The portion

of the form reserved "For Office Use Only" states, "This request

has been processed and the record updated accordingly," and

further states the notice was recorded on September 10, 2012, a

date fourteen days after August 27.

 Montag mailed the form to DEP on August 28 and faxed it to

Zuzeck on August 31. On the fax's cover-sheet Montag explained,

"Limits set upon me do not allow me to do job as I feel is

required."2 At his subsequent disciplinary hearing, Montag

2
 This was not the first time Montag raised concerns about
limitations on his ability to perform. In January 2012, he
wrote and advised the Borough limitations placed on him did not
permit proper performance of his duties as licensed operator.
There is evidence indicating that, in January, Montag was asking
for a coverage arrangement or an increase in pay to compensate
him for being on a call 24/7. The Borough suggested that

 11 A-5315-14T4
testified he thought he was giving DEP notice that he would not

serve as the Borough's licensed operator from a date two weeks

from August 31, 2012, not on August 31. He stated, "I sent in a

. . . two-week notice to take effect on" August 31, and "the

same day my notice was taking effect [Cirulli was told] I would

be on medical leave. I had no other choice at that point in

time." (Emphasis added).

 After his meeting with Cirulli on August 31, Montag faxed

the form to Zuzeck and e-mailed Shell. In his 9:59 a.m. e-mail

to Shell, Montag advised: "I informed [D]on that I will be out

the rest of the year to correct medical problems. Pain has

increased to make work very hard. Do not have timetable yet but

will keep you informed." Shell responded to Montag at 2:46

p.m., copy to Don Cirulli, and wrote:

 Thanks for the heads up Jimmy.

 Please ensure you formally communicate
 this via e:mail [sic] or letter with
 particulars on dates you can expect to be out,
 starting when, etc. We'll need to be sure we
 have sufficient supervisory coverage of our
 water and sewers department and are meeting
 our regulatory obligations. I'll work with
 Don and Mayor Randall on this as soon as we
 know the specific date you inform us that you
 will depart on leave.

Montag's desire to be paid as much as the chief of police
motivated his withdrawal as "licensed operator." At best,
evidence of this prior incident raised a factual dispute for the
jury to resolve.

 12 A-5315-14T4
 Also, please let Don know how we should
 record your leave i.e. sick time, vacation,
 etc. so we have that right.

 Best of luck in addressing your medical
 issues. Get well.

 Cirulli responded, without copy to Montag, "Thanks, Steve.

Don." If Cirulli told Shell he had met with Montag and alerted

Shell to the problem, it was not by way of e-mail included in

this record.

 Montag proceeded to act in a manner consistent with his

understanding that his responsibility as the Borough's licensed

operator would end fourteen days after August 31. Montag took a

sick day on September 4, the day after Labor Day, and later

called in to tell his secretary he had an appointment with his

surgeon that Friday, September 7.

 Meanwhile, Zuzeck had gone to the Borough about Montag's

fax on September 4. When he arrived, a meeting concerning

Montag was underway, but the participants told Zuzeck they did

not know about Montag's fax withdrawing as the Borough's

licensed operator. Zuzeck advised the participants Plattman

could fill in for Montag temporarily with his W-1 license while

the Borough looked for someone else to fill in who had a T-2

license. Even though the participants claimed ignorance of

Montag's notice to DEP, they were already working on an

 13 A-5315-14T4
agreement with another municipality for the services of a

licensed operator services when Zuzeck arrived.

 Zuzeck did not direct the Borough to shut its systems down

for lack of a licensed operator, which he later said DEP would

never do. Nor did Zuzeck file a violation against the Borough

or Montag. Montag's licenses remained in full force.

 On Wednesday, September 5, Montag went to work to do tests

DEP expected the next week. He let Plattman know he was going

to get everything done before he left.

 On September 6, Zuzeck went to Montag's house and spoke to

him. Montag appeared tired and depressed, and he asked Zuzeck

if he was there to arrest him. To Zuzeck, Montag's question was

"out of character" for Montag, who had always been "proactive in

trying to look for guidance to operate the system correctly and

maintain it correctly." Zuzeck acknowledged that Montag could

not do his job while in the condition he observed on September

6. In all his years' of working with Montag, Zuzeck never saw

any reason for concern about Montag doing something to harm the

Borough's systems.

 On September 6, Montag spoke to the mayor by telephone and

agreed to meet on September 7 at 8:30 a.m., even though he had

an appointment with his surgeon at 10:30 a.m. Montag arrived

for the meeting before Shell, and when Shell arrived he asked

 14 A-5315-14T4
Montag where his "Borough vehicle" was. Montag explained he

came in his own truck, and Shell passed this comment — "get used

to the future."

 Montag was asked about his condition and timeframe, but

Montag "did not know exactly what medical issues [he was facing]

and how serious they were." In his view at that time before his

appointment with the surgeon and liver doctor, his condition

"could be as serious as the end of life for [him]."

 Montag told the officials he would be happy to keep them

informed but "could not in good conscience be licensed operator

in charge if [he] was not [there] to oversee the system." He

further explained he would change his mind if there were "a

licensed backup operator." Montag was told he had "lost any

opportunity to be in charge of [the Borough's] system ever

again," and that ended the conversation.

 Montag kept his appointment with the surgeon and was given

a September 20 date for his surgery and dates for follow-up with

his general practitioner and testing by a liver doctor. He

returned to the Borough's office after the appointment and gave

Cirulli the information the doctor had written down for him,

which Cirulli copied and returned. Montag saw Shell as he was

leaving Cirulli. Shell made another comment — "that's the last

note you'll ever need."

 15 A-5315-14T4
 Despite Shell's remark, Montag continued to work part-time

to complete testing DEP required. Montag explained his notice

to DEP did not put the Borough out of compliance with its

obligations under the Act and would not put them out of

compliance unless they refused to appoint another licensed

operator. According to Zuzeck, by September 13, 2012, the

Borough had a fully licensed operator to replace Montag subject

to DEP's approval, which was granted.

 Moreover, despite the Borough's solving the problem of

coverage, on September 18, two days before Montag's scheduled

surgery, the chief of police went to his home and delivered an

"Immediate Suspension Notice" and a "Preliminary Notice of

Disciplinary Action," specifically notice of the Borough's

intention to terminate his employment.

 The Borough's notice alleged Montag filed paperwork

relinquishing his position as operator in charge and was,

therefore, unable to fulfill "and purposefully refused to

fulfill and maintain, those qualifications for the position of

the Superintendent of the [WSD]." The Borough further alleged

that Montag failed to give the Borough prior notice of his

action. Montag admitted he had not told anyone that he was

sending the form to DEP but had said he would be unavailable.

 The notice advised Montag could request a hearing, which

 16 A-5315-14T4
would be held on October 3, 2012, a date the Borough then knew

was within two weeks of his scheduled surgery. At Montag's

request, the hearing was postponed until December. Cirulli and

Montag were the only witnesses.

 The disciplinary hearing was conducted by a "Special

Hearing Committee," which included three members of the

Borough's Council — Shell, Weiss and Lennon. The Council

adopted the Special Committee's recommendation to terminate on

December 18, 2012, and this litigation followed.

 II.

 The LAD "prohibit[s] any unlawful discrimination against

any person because such person is or has been at any time

disabled or any unlawful employment practice against such

person, unless the nature and extent of the disability

reasonably precludes the performance of the particular

employment." N.J.S.A. 10:5-4.1. The LAD defines disability to

include a "physical disability [or] infirmity . . . caused by

bodily injury . . . or illness . . . ." N.J.S.A. 10:5-5(q).

 Montag could prove a discriminatory discharge case based on

direct evidence by showing the Borough "placed substantial

reliance on a proscribed discriminatory factor in making its

decision" to terminate him. Smith v. Millville Rescue Squad,

225 N.J. 373, 394 (2016). In this case, the discriminatory

 17 A-5315-14T4
factor was Montag's actual or perceived disability — his need to

take time to recover from hernia surgery and to identify and

address a suspected liver problem.

 "Direct evidence of discrimination may include evidence 'of

conduct or statements by persons involved in the decisionmaking

process that may be viewed as directly reflecting the alleged

discriminatory attitude.'" Id. at 394 (quoting Fleming v. Corr.

Healthcare Sols., Inc., 164 N.J. 90, 101 (2000)). That evidence

must demonstrate "not only a hostility toward members of the

employee's class, but also a direct causal connection between

that hostility and the challenged employment decision." Ibid.

(quoting Bergen Commercial Bank v. Sisler, 157 N.J. 188, 208

(1999)). To defeat that showing, the Borough would then be

required to "produce evidence sufficient to show that it would

have made the same decision if illegal bias had played no role

in the employment decision." Id. at 395 (quoting Fleming,

supra, 164 N.J. at 100). That would be difficult to prove given

Cirulli's admission that he suggested Montag resign and accept

the value of his accrued sick and vacation leave. In the end,

the Borough achieved that by terminating Montag and crediting

him with his accrued time.

 The Borough's ground for termination was Montag's mailing

and transmitting the fax notifying DEP of his intention to cease

 18 A-5315-14T4
service as the Borough's licensed operator without giving the

Borough prior notice. Viewed in light of Montag's obligation to

give DEP two weeks' notice, the Borough's failure to have a plan

for covering Montag's responsibilities in the event of disabling

accident or illness, and Montag's actual notice to Cirulli and

Shell of his inability to serve while recovering from, as

Cirulli put it, "imminent" surgery, the Borough's non-

discriminatory reason for terminating this nineteen-year

employee was quite slim.

 A jury could reasonably find it too slim considering the

Borough suffered no adverse consequence and, by terminating

Montag, achieved the result Cirulli wanted — avoidance of

arranging coverage by a licensed operator to accommodate Montag

post-operation and during any treatment required for his then-

suspected liver condition. After all, there was evidence the

Borough previously retained more than one employee qualified to

serve as a licensed operator.

 In short, the evidence does not permit the conclusion that

the Borough was entitled to a judgment on Montag's claim of

direct discrimination as a matter of law.

 Montag also had the option to establish discrimination on

an alternative basis: circumstantial evidence of discriminatory

discharge. Under New Jersey law, a plaintiff can prove a case

 19 A-5315-14T4
based on circumstantial evidence of discriminatory discharge

based on disability as follows. The first step requires proof

of a prima facie case — proof of 1) a disability, actual or

perceived, 2) job performance meeting the employer's legitimate,

reasonable expectations at the time of termination, 3)

termination and 4) the employer's looking for a replacement.

Grande v. Clare's Health Sys., __ N.J. __, __ (2017) (slip op.

at 25). By presenting enough evidence to raise a jury question

on each of those elements, Montag was entitled to a presumption

that the Borough's action was discriminatory. Id. at 25-26.

 Because the Borough's defense was a non-discriminatory

reason for terminating Montag, "the burden of production -- not

the burden of proof or persuasion -- shift[ed] to the employer"

to raise a legitimate reason for terminating Montag. Ibid.

(quoting Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363,

382 (1988)). Because the Borough did that, Montag had to prove

the Borough's reason was false, a pretext for discrimination.

See ibid.

 We conclude Montag raised a jury question on pretext. From

his testimony and evidence of his continued effort to meet DEP

testing deadlines, a reasonable jury could find Montag believed

he gave DEP notice of withdrawal to take effect fourteen days

later than August 27 or 31. Thus, he had not withdrawn as

 20 A-5315-14T4
licensed operator without giving the Borough prior notice. He

had several days to alert the Borough or withdraw his notice.

Accordingly, the Borough was not entitled to summary judgment on

a claim of discriminatory termination based on circumstantial

evidence.

 Finally, we cannot conclude that the Borough was entitled

to summary judgment on Montag's claim of failure to accommodate.

The Borough did not even consider the accommodation implicit in

Montag's dialog with Cirulli, which was coverage that would

allow him to take essential sick leave without concern for

violating his obligations as the licensed operator. A jury

could infer that accommodation was reasonable based on the

Borough's conduct in arranging such coverage in the past.

 Moreover, to the extent the Borough's legitimate reason was

based on Montag's failure to provide adequate information about

the leave he would need, a jury believing Montag's account could

reasonably reject that claim as pretext. At that point in time,

Montag did not have a date for the operation and did not know

whether his ominous blood results suggesting liver failure would

prove fatal, which Montag believed was a real possibility.

 The Borough was not entitled to summary judgment on

Montag's claim of failure to accommodate.

 Reversed and remanded.

 21 A-5315-14T4