**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4855-13T1

TIMOTHY G. COOK,

 Plaintiff-Appellant,

v.

BALLY'S PARK PLACE, INC.,
d/b/a BALLY'S CASINO
HOTEL ATLANTIC CITY,

 Defendant-Respondent.

_____

Argued telephonically November 15, 2019 –
Decided December 3, 2019

Before Judges Mayer and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-5339-12.

Michael James Confusione argued the cause the appellant (Hegge & Confusione, LLC, attorneys; Michael James Confusione, of counsel and on the brief).

Jennifer B. Barr argued the cause for respondent (Cooper Levenson PA, attorneys; Gerard W. Quinn, on the brief).

PER CURIAM

Plaintiff Timothy G. Cook appeals from a June 2, 2014 order granting defendant Bally's Park Place, Inc., d/b/a Bally's Casino Hotel Atlantic City (Bally's) summary judgment and dismissing his complaint. We affirm.

Plaintiff was hired by Bally's as a surveillance officer in March 1985. In 1988 and 1992, plaintiff was formally reprimanded for loud, abusive and argumentative behavior. When he was reprimanded in 1992, his Employee Performance Record noted his behavior was "completely unprofessional and a gross violation of the Surveillance Department's internal controls. Any further behavior of this kind would lead to termination." In 1996, Bally's promoted plaintiff to "dual rate shift supervisor."

Plaintiff received no other promotions while at Bally's. However, he received a positive performance review in June 2011, recognizing his reporting of a cheating scam involving the casino game of mini-baccarat. Plaintiff assisted the Division of Gaming Enforcement (DGE) in an investigation of the scam by reporting to the DGE and State police that he suspected the scam's perpetrators colluded with Bally's employees. Subsequently, his suspicion was deemed to be unsupported.

A-4855-13T1

In 2006, Claridge Hotel and Casino (Claridge) merged with Bally's, and the merger included their surveillance departments. Two shift supervisors from Claridge became shift supervisors at Bally's. One of those supervisors, J.T.,[1] became plaintiff's only direct supervisor. Plaintiff admitted to complaining, "it wasn't exactly fair that [Bally's] was bringing in people that have absolutely no experience at Bally's and you're putting them in charge of the shift when you have people here that have that experience." Moreover, plaintiff conceded that he "took it upon himself" to raise complaints and express the concerns of other employees about the new shift supervisors to the Director of Surveillance and to the Employee Relations Department. According to plaintiff, the Employee Relations Department encouraged subordinates to alert it to complaints they had about the conduct of supervisors.

In June 2011, just weeks after plaintiff was recognized for his work with the DGE in the mini-baccarat cheating scam, a complaint was lodged against him. Specifically, a surveillance officer, E.B., filed a written complaint with the Employee Relations Department against plaintiff, claiming that on June 24, 2011, plaintiff entered the breakroom, shouted at E.B. and accused him of

---

[1] We use initials in order to protect the privacy of individuals who are not involved in this appeal.

A-4855-13T1

ignoring plaintiff when asked a direct question. E.B. reported the incident to his supervisor, J.T., and stated he would formally complain to the Employee Relations Manager (Relations Manager). When plaintiff learned E.B. was planning to file a complaint with Employee Relations, he confronted E.B. and called him a "liar." E.B. requested a shift change, expressing fear plaintiff would use his position to harass and retaliate against him.

The Relations Manager received permission from the Vice President of Human Resources to open an investigation to address E.B.'s complaint. She later testified during a deposition that it was "[a]bsolutely not alright . . . to scold an employee, in any manner, for filing a complaint." She further testified it was inappropriate for a supervisor to try to deter an employee from making a complaint or from raising an issue with the Employee Relations Department.

In investigating E.B.'s complaint, the Relations Manager interviewed numerous employees. The employees noted plaintiff's poor temperament, use of inappropriate language, unfair distribution of overtime, and encouragement among coworkers to submit negative feedback about J.T. When the Relations Manager interviewed J.T., he confirmed E.B. reported concerns about plaintiff's behavior in June 2011 and asked to speak with the Employee Relations Department. According to J.T., E.B. also disclosed plaintiff had spoken poorly

4

about J.T.'s performance to other employees, including the Director of Surveillance. J.T. found plaintiff's behavior harassing.

Plaintiff admitted he approached J.T. after learning of E.B.'s complaint and blamed J.T. for E.B.'s decision to lodge a complaint. In his interview with the Relations Manager, plaintiff also admitted to giving "bogus information" to State Police. However, she confirmed "it never came up after that because that's not what we were focusing on in this investigation." When she was asked in her deposition if the "bogus information" pertained to the mini-baccarat scam, the Relations Manager testified, "[w]e never looked into it. Afterwards, especially during the [B]oard of [R]eview, it became clear that's why [plaintiff] thought he got terminated, but that was not the reason he got terminated."

The Relations Manager issued a report detailing the results of her month-long investigation. Her report confirmed: (1) six employees verified plaintiff raised his voice in an unprofessional manner; (2) four employees asserted plaintiff suggested they poorly rate J.T. on the Supervisory Feedback Survey program; (3) two employees complained plaintiff made racist comments; and (4) one employee contended plaintiff made misogynistic comments.

The Relations Manager met with the Vice President of Human Resources and the General Manager of Bally's property to discuss her report. Based on the

discussion, Bally's management was inclined to terminate plaintiff's employment. Ultimately, Bally's determined "[plaintiff's] conduct toward his subordinates, peers, and superior was so severe that it warranted termination." It is undisputed that Bally's written policies confirmed "mistreatment of other employees was grounds for immediate dismissal."

On August 4, 2011, the Relations Manager terminated plaintiff's employment, in the presence of the Director of Surveillance. She provided the following reasons for plaintiff's dismissal: (1) inappropriately raising his voice to employees; (2) suggesting employees poorly evaluate J.T.; and (3) supplying false information to the DGE. According to the deposition testimony of the Director of Surveillance, when the Relations Manager mentioned the DGE, plaintiff raised his voice to the Relations Manager. She then advised plaintiff she would withdraw this reason as grounds for his termination. The record reflects the final termination notice stated only the first two reasons for plaintiff's termination.

Plaintiff requested and was granted an appeal hearing with the Board of Review to address his firing. The Board upheld plaintiff's termination based on the final termination notice and told plaintiff his reporting on the mini-baccarat scam was not one of the reasons for his termination.

A-4855-13T1

Plaintiff then instituted suit against defendant, alleging violations of common law whistleblowing under Pierce v. Ortho Pharm. Corp., 84 N.J. 58 (1980).[2] In response, Bally's moved for summary judgment. On June 2, 2014, the trial court granted summary judgment, finding "[t]here [was] no evidence that [p]laintiff was terminated due to an investigation."

On appeal, plaintiff argues the trial court erred in granting summary judgment. He also insists he was terminated in violation of New Jersey's Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, and protections promulgated by Pierce. The two avenues for relief are harmonious. Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 103 (2008).

We review a ruling on a summary judgment motion de novo, applying the same standard governing the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017) (citing Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)). Thus, we consider, as the trial judge did, whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Holmes v.

---

[2] Plaintiff initially brought an action for both retaliatory discharge and defamation. He does not appeal the summary judgment dismissal of his defamation claim.

Jersey City Police Dep't, 449 N.J. Super. 600, 602-03 (App. Div. 2017) (citation omitted).

A party opposing summary judgment does not create a genuine issue of fact simply by offering a sworn statement. Carroll v. N.J. Transit, 366 N.J. Super. 380, 388 (App. Div. 2004). "'[C]onclusory and self-serving assertions' in certifications without explanatory or supporting facts will not defeat a meritorious motion for summary judgment." Hoffman v. Asseenontv.com, Inc., 404 N.J. Super. 415, 425-26 (App. Div. 2009) (citations omitted). Applying these standards, we discern no reason to disturb the summary judgment ruling of the motion judge.

Plaintiff was an at-will employee. Thus, his termination is not actionable absent a violation of a protected right. See Witkowski v. Lipton, 136 N.J. 385, 397-98 (1994).

CEPA prohibits an employer from taking retaliatory action against an employee who discloses, objects to, or refuses to participate in certain actions that the employee reasonably believes are illegal or in violation of public policy. N.J.S.A. 34:19-3. "[T]he complained of activity must have public ramifications, and . . . the dispute between employer and employee must be more than a private disagreement." Maw v. Advanced Clinical Communs., Inc., 179 N.J. 439, 445 (2004).

A CEPA plaintiff is not obligated to prove that an employer violated a law, regulation, or clear mandate of public policy. Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003). Rather, it is only necessary to prove the plaintiff reasonably believed that to be the case. Ibid. Additionally, a plaintiff's whistleblowing must involve conduct the whistleblower reasonably believed posed a "threat of public harm," and "not merely a private harm or harm only to the aggrieved employee." Maw, 179 N.J. at 445 (citation omitted).

Here, the underlying statute triggering CEPA protections is the Casino Control Act (CCA), N.J.S.A. 5:12-80. See Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276 (App. Div. 2001) (where a CEPA cause of action was maintained based on an employee reporting a violation of casino law). The CCA imposes an affirmative obligation on casino employees to inform the DGE of "any action which they believe would constitute a violation of the Act" and provides that "[n]o person who . . . informs the commission or division shall be discriminated against . . . ." N.J.S.A. 5:12-80. Thus, plaintiff's disclosure to the DGE of any reasonable suspicions about the mini-baccarat scam would be protected.

Nonetheless, to prevail on a retaliatory discharge claim under CEPA, a causal connection between the whistleblowing activity and retaliation must be established. A prima facie case of unlawful retaliation consists of the following

elements: (1) the plaintiff reasonably believed the employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) a "whistle-blowing" activity, as described in N.J.S.A. 34:19-3 was performed; (3) an adverse employment action was taken against the plaintiff; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. Dzwonar, 177 N.J. at 462 (citations omitted).

The complainant must prove the "retaliatory discrimination was more likely than not a determinative factor in the decision." Donofry, 350 N.J. Super. at 293 (quoting Kolb v. Burns, 320 N.J. Super. 467, 479 (App. Div. 1999)). A plaintiff may rely on either a "pretext" or a "mixed-motives" theory to satisfy this burden of proof. Fleming v. Corr. Healthcare Sols., 164 N.J. 90, 100 (2000) (citation omitted).

In a mixed-motives case, "direct evidence of discriminatory animus leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it." Id. at 101 (quoting Starceski v. Westinghouse Electric Corp., 54 F.3d 1089, 1096 n.4 (3d Cir.1995). Under a mixed-motives theory, in addition to proving the elements of a prima facie case,

a plaintiff must prove discrimination was a motivating factor in the employer's decision. Id. at 101.

In a "pretext," or burden-shifting, case, after a plaintiff sets forth a prima facie claim of discrimination, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Here, plaintiff could not prevail on either a mixed-motives or pretext theory. As the motion judge properly found, there was no competent evidence to prove Bally's was improperly motivated by a retaliatory desire to terminate plaintiff for reporting a mini-baccarat scam a year prior to his termination. Instead, as the Relations Manager's report confirmed, plaintiff was terminated due to his documented mistreatment of his coworkers.

Accordingly, even if plaintiff had established a prima facie CEPA claim, Bally's "articulate[d] some legitimate, non-discriminatory reason for the employee's rejection." Erickson v. Marsh & McLennan Co., 117 N.J. 539, 550 (1990) (citations omitted). "Where the employer produces such evidence, the presumption of discrimination disappears." Bergen Commercial Bank v. Sisler, 157 N.J. 188, 211 (1999) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993)). Additionally, plaintiff's admissions of his inappropriate

11

behavior independently created a legitimate, non-discriminatory reason for his termination.

We see no basis to disturb the motion judge's finding that plaintiff failed to raise a genuine issue of material fact to defeat Bally's motion for summary judgement. <u>See</u> <u>Klein v. Univ. of Med. & Dentistry of N.J.</u>, 377 N.J. Super. 28, 38-39 (App. Div. 2005). To the extent we have not addressed other arguments raised by plaintiff, we find they are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4855-13T1